### UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Herbert Burgess (M35077), | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 20 C 4216 |
| v. | ) | |
| | ) | Hon. Jorge L. Alonso |
| | ) | |
| Daniel Monti, Day-to-Day Warden, | ) | |
| Centralia Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Herbert Burgess, a prisoner at the Centralia Correctional Center[1], brings this *pro se* habeas corpus action under 28 U.S.C. § 2254 to challenge his 2013 convictions for aggravated criminal sexual assault and unlawful restraint in the Circuit Court of Cook County. (Dkt. 1.) For the reasons below, this Court denies Petitioner's § 2254 petition and declines to issue a certificate of appealability.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Daniel Monti, the Day-to-Day Warden at Centralia Correctional Center has been automatically substituted as defendant.

## BACKGROUND[2]

### I.    The Sexual Assault and Petitioner's Trial

#### *The Sexual Assault*

Following a jury trial, Petitioner was found guilty of aggravated criminal sexual assault, criminal sexual assault, and unlawful restraint of 15-year-old, J.V. *People v. Burgess*, 2015 IL App (1st) 130657, ¶¶ 1, 5. The evidence at trial established that in the summer of 2011, Petitioner, J.V., and J.V.'s mother worked at the same company. *Id.* at ¶ 5, 28. Petitioner had known J.V.'s father for many years, and J.V., his father, and Petitioner had planned to have a barbecue on August 8, 2011, after Petitioner and J.V. finished working. *Id.* at ¶¶ 28, 31.

After work, Petitioner drove J.V. to his apartment to pick up some groceries for the barbecue. *Id.* at ¶ 31. While inside, Petitioner told J.V. he had purchased a black jockstrap and a white jockstrap for him and told J.V. to try them on. *Id.* J.V. refused and tried to leave the apartment, but Petitioner slammed the door (causing it to crack) and locked it to prevent J.V. from leaving. *Id.* at ¶¶ 31, 34. Petitioner forced J.V. into the bathroom and demanded that J.V. try on the jockstrap in front of him. *Id.* at ¶ 31. He then pushed J.V. into the bedroom, sexually assaulted him, and ejaculated onto the victim's shirt. *Id*. A few days later, Petitioner allegedly sexually assaulted J.V. again at their workplace, which alleged assault became the subject of a separate criminal case in Lake County. *Id.* at ¶ 5.

---

2 The following facts are drawn from the state court record, (Dkt. 17), and state appellate court opinions. *People v. Burgess*, 2015 IL App (1st) 130657; (Dkt. 17-10) (*People v. Burgess*, No. 1-17-149 (Ill. App. Ct. Aug. 22, 2019) (unpublished summary order under Illinois Supreme Court Rule 23(c)). The state court's factual findings are presumed correct unless Petitioner rebuts this presumption by clear and convincing evidence. *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citing 28 U.S.C. § 2254(e)(1); *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018)).

*Petitioner's Offers of Proof*

Petitioner maintained that he was being framed by J.V.'s father to whom Petitioner allegedly paid $20,000 for a purported business venture. *Id.* at ¶ 21. He claimed the father coerced his son into bringing false claims against Petitioner so that he could keep Petitioner's money. *Id.*

Before trial, defense counsel made an offer of proof related to Petitioner's theory that he was being framed. *Id.* at ¶ 15. According to Petitioner's counsel, J.V.'s uncle allegedly overheard J.V. tell his father that he did not want to lie anymore. *Id.* Defense counsel stated that he wanted to be able to ask the victim if he made this statement to his father. *Id.* The trial court ruled that defense counsel could ask J.V. if he made such a statement to his uncle. *Id.* If he denied it, the uncle could testify as to what J.V. said to him. *Id.*

Additionally, defense counsel advised the trial court that he wished to introduce during opening statement and during cross-examination of J.V. that a monetary demand was made by J.V.'s parents to Petitioner's employer in connection with the workplace-sexual-assault case that was, at the time, pending against Petitioner in Lake County. *Id.* at ¶ 16. Counsel argued that this evidence should be permitted, as the trial court had previously granted the State's motion to introduce evidence of the Lake County criminal case as proof of other crimes. *Id.* The trial court ruled that it would reconsider introduction of such evidence once defense counsel briefed the court with case law that supported introduction of a monetary demand made in an unrelated case. *Id.*

After opening statements, defense counsel presented several cases to the court in support of his monetary-demand argument, as well as a demand letter from a law firm directed to Petitioner's employer stating J.V.'s parents had retained the firm for an impending lawsuit. *Id.* at ¶ 23. Defense counsel also produced a letter from the same firm stating that it had been retained to represent J.V. but did not indicate who had retained the firm. *Id.* Because defense counsel had

repeatedly represented to the jury during opening statements that the only evidence of the sexual assault would come through the father who allegedly coerced his son into making these claims, the trial court did not "believe based on the records [counsel] made, based on the documents … tendered, based on what [the court had] been told" that it would be a proper area of cross-examination "of a 15 year old victim of a sexual assault that his family on his behalf filed some sort of action against the company for a sexual assault that is pending in Lake County." (Dkt. 17-15, p. 567.) The trial court ruled that Petitioner would not be allowed to cross-examine J.V. on the monetary demand but advised it would readdress the issue if warranted by the father's testimony, or if the issue subsequently became ripened as to J.V. *Id.* at 567-68.

### The State's Case

The State called J.V. as its first witness. *Burgess*, 2015 IL App (1st) 130657, ¶ 27. J.V. testified that he started working with Petitioner in early July, one month before the sexual assault occurred at Petitioner's apartment. *Id.* at ¶ 28. He explained that during the workday, Petitioner would check on him and M.M., another minor who had a summer job with the company, six to seven times per day. *Id.* During these "check-ups," Petitioner would buy J.V. Gatorades, put his arm around J.V.'s shoulders, and slap J.V.'s behind. *Id.* The victim explained that Petitioner called J.V. and M.M. "his boys," and would buy lunch for them and have them eat lunch in his office. *Id.* He also testified that a few weeks after starting the job, Petitioner took him and M.M. to the gym. *Id.* at ¶ 29. J.V. stated that while they were changing in the locker room after their workout, Petitioner pulled back the shower curtain where J.V. was showering and asked him if he needed

any soap. *Id.* Later, when J.V. was changing, Petitioner asked J.V. how his "python" was doing and told J.V. that Petitioner had looked at J.V.'s "python" while J.V. was in the shower. *Id.*

Following the gym incident, the victim explained that Petitioner's "check-ups" at work increased to 10 to 12 times per day. *Id.* at ¶ 30. Petitioner also began driving J.V. to and from work. *Id.* During these trips, J.V. described how Petitioner would touch his thigh and, on one occasion, touched the tip of his penis. *Id.* One day, on the way home from work, Petitioner stopped and bought J.V. a PlayStation 3 with six video games. *Id.*

On the day of the sexual assault, J.V. explained that he tried to leave Petitioner's apartment after Petitioner told him to try on one of the jockstraps that he had purchased for him. *Id.* at ¶ 31. J.V. described how Petitioner slammed the door to prevent J.V. from leaving, which made a sound like the door was breaking. *Id.* J.V. testified that Petitioner first forced him into the bathroom where J.V. took off his pants and underwear to put on the jockstrap, and that Petitioner then forced him into the bedroom where Petitioner fondled his buttocks. *Id.* He described how Petitioner pushed J.V. facedown onto the bed and that J.V. felt a cold liquid on his buttocks. *Id.* The victim testified that Petitioner then held J.V. down while Petitioner used his penis to anally penetrate J.V. *Id.* J.V. explained that he felt pain and "something wet" on the back of his shirt. *Id.* After J.V. was assaulted, he ran to the bathroom, closed the door, and dressed, leaving the jockstrap on the bathroom floor. *Id.* J.V. left the bathroom crying. *Id.* J.V. testified that Petitioner told J.V. that if J.V. ever said anything J.V.'s mother would lose her job and J.V. would be living on the street. *Id.*

Petitioner then drove J.V. to his father's house. *Id.* J.V. ran upstairs without saying anything to his father about the assault.[3] *Id.* The victim testified that he took an hour-long shower and, upon

---

3 J.V.'s parents were separated, and he lived with each of them for varying periods of time at his discretion. *Burgess*, 2015 IL App (1st) 130657, ¶ 31 n.2.

leaving the shower, noticed his T-shirt had a yellow stain on it. *Id.* J.V. explained that he had recently learned about DNA in school and believed the stain on the shirt was Petitioner's semen. *Id.* Afraid no one would believe him about the assault, he put the T-shirt in a plastic bag and kept it in his closet. *Id.*

J.V. testified that, a few days later, Petitioner sexually assaulted him again while locking up their workplace for the night. *Id.* at ¶ 32. J.V. testified that Petitioner used one hand to hold J.V.'s arms behind his back and used his other hand to pull down J.V.'s pants. *Id.* J.V. described how Petitioner pulled on J.V.'s penis and pubic hairs, and inserted his fingers into J.V.'s buttocks. *Id.* Petitioner again told J.V. that if J.V. told anyone, J.V.'s mother would lose her job. *Id.*

J.V. explained that he eventually told M.M. about the sexual assault. *Id.* at ¶ 33. On that day, he received a text message from Petitioner that read: "If I find out you said something, you'll be living on the street." *Id.* J.V. was let go from his job the next day. *Id.*

Once J.V.'s father learned of the sexual assault, he drove his son to the police station to speak with detectives. *Id.* at ¶ 34. The detectives took a picture of J.V.'s phone showing the text message from Petitioner. *Id.* J.V. was then brought to the hospital to be examined. *Id.* After the hospital, a police officer met with J.V. at his father's house, where J.V. gave the detective the plastic bag with the stained T-shirt. *Id.*

J.V. further testified that he lived with his grandmother for a period of time following the incident. (Dkt. 17-15, p. 642-43.) He explained that his uncle also used to live with his grandmother, but they never lived at her house at the same time. *Id.* at 643-44. J.V. stated that he never had any conversations about the case with his father in front of his uncle, nor did he ever discuss the case at all at his grandmother's house. *Id.* at 644-46.

Heather Evanoka, who lived next door to Petitioner, testified that, on the day of the sexual assault, she heard an altercation coming from Petitioner's apartment. *Burgess*, 2015 IL App (1st) 130657, ¶ 39. She explained that she heard Petitioner's door slam and heard Petitioner yell, "I'm taking you home." *Id.*

Following Evanoka's testimony, Petitioner moved for a mistrial. Petitioner's theory was that the defense's case was "irrefutably damaged" when the trial court effectively barred Petitioner from introducing J.V.'s financial motive by way of the demand letter that was sent to Petitioner's employer in connection with the Lake County case. *Id.* at ¶ 41. The trial court denied the motion.[4] *Id.* at ¶ 45.

Lee Schaps, a detective with the Mount Prospect police department, testified that he procured a search warrant and searched Petitioner's apartment. *Id.* at ¶ 47. Detective Schaps observed a crack in Petitioner's door. *Id.* Inside the apartment, he found white and black jockstraps in a gym bag, as well as a tube of personal lubricant in the nightstand in the bedroom. *Id.*

Ronald Tomek, a forensic scientist with the Illinois State Police, testified that he tested the T-shirt that the Mount Prospect police department recovered from the victim. *Id.* at ¶ 58. Using an alternate light source (ALS), Tomek identified that there was a semen stain on the back of the T-shirt and removed a section of the stain for DNA testing. *Id.* Andrew Garinger, another forensic scientist with the Illinois State Police, testified that the sample obtained from the T-shirt matched the DNA obtained from Petitioner. *Id.* at ¶ 61. J.V.'s DNA was not found on the T-shirt. *Id.*

---

4 Upon denial of his motion for a mistrial, Petitioner made a separate motion for substitution of judge. *Burgess*, 2015 IL App (1st) 130657, ¶ 45. The trial was recessed so that the motion could be transferred to a different judge for a hearing. *Id.* The trial resumed upon denial of the motion. *Id.*

Garinger explained, however, that it was possible for a person to wear a T-shirt without leaving their DNA. *Id.*

William Abruscato, Petitioner's cellmate in Lake County Jail, testified that Petitioner told him about J.V. while they were incarcerated. *Id.* at ¶ 63; (Dkt. 17-15, p. 886.) Abruscato testified that Petitioner claimed J.V. told Petitioner he was attractive and that he liked older men. *Burgess*, 2015 IL App (1st) 130657, ¶ 63. He told Abruscato that he would buy J.V. various gifts and would also take him to the gym where he observed J.V.'s penis, which he referred to as an "anaconda." *Id.* Abruscato testified that Petitioner told him about the day he brought J.V. to his apartment before the barbecue, explaining that Petitioner first claimed the two had an argument about the expiration date of an item of food, but later recounted how Petitioner had bought J.V. a gym item to model for him. *Id.* Petitioner told Abruscato that when J.V. tried to leave his apartment, he slammed the door to prevent him from leaving and then engaged in anal sex with him. *Id.* Abruscato testified that Petitioner explained that J.V. was crying and was very upset after the sexual encounter and that "[Petitioner's] exact words were to tell the kid to grow up and be a man." (Dkt. 17-15, p. 899.)

Abruscato testified that he was in jail at the time for aggravated domestic battery and for violating an order of protection. *Id.* at ¶ 63. Abruscato pled guilty to the offense and received two years of probation. *Id.* Abruscato testified that he did not receive a deal in exchange for his testimony against Petitioner and that the reason he came forward was because Petitioner told him several times that "[h]e was going to have the boy beat up and killed with a baseball bat and make it look gang related" because "if there was no victim, no case." (Dkt. 17-15, p. 905); *Burgess*, 2015 IL App (1st) 130657, ¶¶ 63, 65.

Abruscato denied being given any paperwork regarding Petitioner's case from either his defense attorney or the Lake County prosecutor. *Burgess*, 2015 IL App (1st) 130657, ¶ 68. He

further testified that Petitioner did not have any documents about his case in their cell and, even if there had been such paperwork, he would not have been able to read anything because he was without his glasses in jail. *Id.* at ¶ 67.

### *Petitioner's Case*

Petitioner testified in his own defense and denied the sexual assault allegations. *Id.* at ¶ 106. He explained that on the day of the barbecue, he brought J.V. to his apartment to get his credit card and items for the cookout. *Id.* He claimed that J.V. became upset when Petitioner suggested cooking potatoes that were past their expiration date. *Id.* Petitioner alleged that J.V. started yelling at him, but denied yelling in return. *Id.* The two then left to buy groceries. *Id.* He denied raping J.V. or forcing him to try on a jockstrap. *Id.* He also denied slamming his apartment door and claimed not to know why the door was cracked. *Id.* When they arrived at J.V.'s father's house for the barbecue, Petitioner explained the father cancelled for unspecified reasons. *Id.*

In line with his theory that J.V.'s father was framing him, Petitioner testified that he occasionally masturbated into white T-shirts in his apartment and that he had left J.V. and his father alone in his apartment a number of times. *Id.* at 107. In connection with their attempted business venture, Petitioner claimed he gave the father $19,000 but did not have any documentation of this transaction, nor any documents detailing their arranged business partnership. *Id.* at ¶ 111.

As to his former cellmate, Petitioner denied telling Abruscato that he planned to have J.V. killed. *Id.* at 107. Instead, he claimed that Abruscato knew of the allegations against him because Petitioner had the police reports with him in jail and would leave them in his cell when he was not around. *Id.* Petitioner confirmed that his counsel provided him with the police reports but denied

knowing that his possession of them violated Illinois Supreme Court Rule 415.[5] *Id.* at 108. During a sidebar, defense counsel requested the judge instruct the jury that Petitioner did not do anything wrong for having the police reports with him in jail. *Id.* The trial court refused, stating: "No. In doing so, I'm going to be hiding the fact that you did." (Dkt. 17-15, p. 1430.) Instead, the trial court suggested a series of questions that could be asked of Petitioner to show that he did not know that he was not supposed to have the reports. *Id.* at 1431. Petitioner testified that he did not request the reports from his attorney. *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 109.

Petitioner called J.V.'s father to testify as part of his defense. *Id.* at ¶ 79. J.V.'s father testified that he owned a sewer and plumbing company for 15 years and had known Petitioner for the same length of time. *Id.* at ¶¶ 80-81. In the months preceding the sexual assault, the two had discussed opening a sewage business together, and Petitioner had applied for a business license for this company. *Id.* at ¶ 81. J.V.'s father explained, however, that their plans fell through because Petitioner was too busy to put in the effort to start a business. *Id.* The father denied that Petitioner gave him money to start the business and explained that he did not consider Petitioner an investor in the business because he was bankrupt. *Id.*

The father explained that on the evening of their scheduled barbecue, his son came "barging in the door" and "ran in the bathroom" where "[h]e stayed" for approximately two hours. (Dkt. 17-15, p. 1050.) J.V. did not tell his father what had happened, and the father would later learn of the sexual assault through M.M. *Id.* at 1050, 1080-82. J.V.'s father acknowledged that he hired a law firm to make a monetary demand from Petitioner's employer in connection with the sexual assault that occurred at Petitioner and J.V.'s workplace, but the father denied that he or his son had

---

[5] Illinois Supreme Court Rule 415 provides that discovery materials are to remain in the exclusive custody of the defendant's attorney "unless the court authorizes dissemination." Ill. S. Ct. R. 415.

received any financial compensation for the assault that took place at Petitioner's apartment. *Burgess*, 2015 IL App (1st) 130657, ¶¶ 82, 84. The father further testified that he never had a conversation with the uncle regarding the sexual assault of his son, nor did he tell the uncle that he planted the T-shirt in J.V.'s closet. *Id.* at ¶¶ 82-83. He explained that he was not aware of the T-shirt in his son's closet until the police recovered it. *Id.* at ¶ 84.

J.V.'s uncle also testified for the defense. *Id.* at ¶ 94. The uncle explained that he lived with J.V.'s grandmother for some time in the months following the sexual assault. *Id.* at ¶ 95. During his testimony, defense counsel asked the uncle whether he ever heard a conversation between J.V. and the father regarding the case, attempting to elicit that the uncle overheard J.V. say to his father that he did not want to lie anymore. *Id.*; (Dkt. 17-15, p. 1136-37.) The trial court sustained the State's objection to this line of questioning, ruling that defense counsel had not asked J.V. whether he ever told his uncle that he was tired of lying on cross-examination and, therefore, could not perfect impeachment of J.V. on this issue. (Dkt. 17-15, 1137-39.)

Petitioner's counsel moved to a new line of questioning, asking the uncle whether he had overheard conversations that his brother, J.V.'s father, had about the case. *Id.* at 1140. The uncle testified that he heard the father say several times to both J.V. and the grandmother at the grandmother's house that he had planted the T-shirt used as evidence against Petitioner. *Id.* at 1141-43, 1145-47. He admitted, however, that he is not close to his brother, J.V.'s father. *Burgess*, 2015 IL App (1st) 130657 at ¶ 96.

Other evidence presented by Petitioner included the testimony of Dr. Lina Albujamra who performed the medical examination of J.V. at the hospital. *Id.* at ¶ 77. She did not observe any abrasions or bruising on J.V. during her examination, but she testified that it would not be unusual for a victim of sexual assault not to show rectal trauma two weeks after the assault took place. *Id.*

The doctor explained that most sexual assault victims do not display any physical abnormalities even a day after an assault. *Id.*

### The State's Rebuttal

The State called J.V.'s grandmother in rebuttal, who testified that at no time during the several months that the uncle lived with her were J.V., the father, and the uncle in her house together at the same time. *Id.* at ¶ 118. She further testified that J.V.'s case was never mentioned in her house and that the father and the uncle did not "get along." *Id.*

### Closing Argument

During closing argument, Petitioner argued that J.V., his father, his grandmother, and Abruscato lied, and that when there are "this many lies" in a trial, the jury must vote not guilty. *Id.* at ¶ 123. At one point during closing argument, Petitioner's counsel asked for more time. *Id.* The trial court denied his request, stating: "Counsel, you're ten minutes over the time that the Court allowed you in the first place." (Dkt. 17-15, p. 1591.)

In rebuttal, the State responded to Petitioner's closing argument, stating: "You know, folks, there's an old saying, country saying. It says when you get kicked by the horse the first time, it's the horse's fault. When you get kicked the second time, it's your own fault. Don't let anybody kick you into finding this guy not guilty." (Dkt. 17-15, p. 1608.) The state continued, over Petitioner's objection, arguing: "Because for that to happen, you've got to believe that the evidence that was presented here was fabricated, incompetently handled, that there was perjury, and the unluckiest man in the world sat over here and had a T-shirt found in his laundry." *Id.* at 1609.

### Conviction and Sentencing

During deliberations, the jury sent a note indicating they were deadlocked. *Burgess*, 2015 IL App (1st) 130657 at ¶ 125. The trial court instructed the jurors to continue deliberating. *Id.* The

jury found Petitioner guilty of unlawful restraint, criminal sexual assault, and aggravated criminal sexual assault. *Id.* The trial court sentenced Petitioner to concurrent prison terms of 24 years for aggravated criminal sexual assault, 15 years for criminal sexual assault, and three years for unlawful restraint. *Id.* at ¶ 126.

## II. Post-Trial Proceedings

### *Petitioner's Direct Appeal*

On direct appeal of his convictions, Petitioner claimed: (1) he was denied his right to present a complete defense; (2) judicial bias; (3) prosecutorial misconduct; (4) the trial court erred in allowing the State to rehabilitate witnesses with prior consistent statements; (5) the trial court considered improper aggravating factors during sentencing; (6) his aggravated criminal sexual assault conviction was the result of a double enhancement; and (7) his criminal sexual assault and unlawful restraint convictions violated Illinois's one-act, one-crime doctrine. (Dkt. 17-1.) The state appellate court rejected all of Petitioner's claims with the exception of Petitioner's one-act, one-crime challenge. *Burgess*, 2015 IL App (1st) 130657, ¶¶ 238-39. The state appellate court concluded that Petitioner's conviction for criminal sexual assault resulted from the same act as his conviction for aggravated criminal sexual assault and, therefore, vacated his criminal sexual assault conviction. *Id.* at ¶¶ 236, 239.

Petitioner sought leave to appeal the state appellate court's ruling to the Supreme Court of Illinois. (Dkt. 49-1.) His petition for leave to appeal (PLA) argued that he was denied his constitutional right to present a complete defense: (1) when he was barred from impeaching J.V. with his prior inconsistent statement that he did not want to lie anymore; and (2) when he was barred from introducing evidence of the monetary demand related to the Lake County sexual assault case during both opening statements and cross-examination of J.V. *Id.* The Supreme Court

of Illinois denied his PLA, *People v. Burgess*, No. 119842, 42 N.E.3d 372 (Ill. 2015) (Table), and

the Supreme Court of the United States denied his petition for writ of certiorari. *Burgess v. Illinois*,

No. 15-8859, 136 S. Ct. 2464 (2016) (Mem.).

### *Petitioner's Postconviction Proceedings*

Following the completion of his direct appeal, Petitioner pursued postconviction relief. His

*pro se* postconviction petition alleged various grounds of ineffective assistance of trial counsel,

prosecutorial misconduct, and judicial bias. (Dkt. 17-7, p. 3-29.) The trial court summarily

dismissed the petition.[6] *Id.* at 1.

Petitioner appealed the trial court's summary dismissal, and the Office of the State

Appellate Defender was appointed. (Dkt. 17-13, p. 512, 514.) Appointed counsel filed a motion

for leave to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). (Dkt. 17-8,

p. 2-22.) In support of the withdrawal request, counsel explained that Petitioner had forfeited his

ineffective assistance of counsel claims by failing to raise such arguments on direct appeal and, in

any event, his allegations were conclusory, rebutted by the record, or lacked merit. *Id.* at 16-21.

Additionally, counsel argued that because Petitioner's prosecutorial misconduct and judicial bias

claims were previously raised and rejected on direct review, they could not be re-raised in

postconviction proceedings. *Id.* at 21. Petitioner filed a "motion of objections" in response to

counsel's *Finley* motion, maintaining that his ineffective assistance, prosecutorial misconduct, and

judicial bias claims had merit. (Dkt. 17-9.)

---

6 The state court record includes only a criminal disposition sheet that indicates the trial court
denied Petitioner's petition for postconviction relief on December 6, 2016. (Dkt. 17-7, p. 1.) There
is no written order pertaining to the dismissal, and an affidavit from an Official Court Reporter of
the Circuit Court of Cook County avers that there is no record of proceedings from the date of
dismissal. (Dkt. 17-15, p. 9.)

Upon "careful[] review[]" of the record, counsel's *Finley* motion, and Petitioner's response, the state appellate court concluded Petitioner had not raised any issues of arguable merit to be asserted on appeal, granted counsel's *Finley* motion, and affirmed the judgment of the trial court. (Dkt. 17-10, p. 3) (*People v. Burgess*, No. 1-17-149 (Ill. App. Ct. Aug. 22, 2019) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

In his *pro se* PLA, Petitioner challenged the state appellate court's decision to affirm the trial court's dismissal when it granted counsel's *Finley* motion, arguing it was error for the court to rule on an appeal that the State had not responded to or opposed. (Dkt. 17-11, p. 3-9.) The Supreme Court of Illinois denied Petitioner's PLA, *People v. Burgess*, No. 125544, 140 N.E.3d 247 (Ill. 2020) (Table), and the Supreme Court of the United States denied his petition for writ of certiorari. (Dkt. 17-12.) Petitioner then filed the instant habeas corpus petition. (Dkt. 1.)

## DISCUSSION

Petitioner's § 2254 petition raises three claims: ineffective assistance of trial counsel, prosecutorial misconduct, and judicial bias. (Dkt. 1, p. 6-13.) In support of his claims, he provides a bullet-pointed, non-exhaustive list of dozens of occurrences that he contends are examples of ineffective assistance, prosecutorial misconduct, and judicial bias. *Id.* Rather than recount each of these examples in full, the Court summarizes the instances that Petitioner claims entitle him to relief.

First, Petitioner argues his trial counsel was ineffective on various grounds, including: (a) failing to conduct a reasonable investigation on exculpatory evidence; (b) failing to object to the State's leading questions; (c) failing to support with proper evidence the argument that evidence of the Lake County monetary demand was admissible; and (d) failing to perfect impeachment of various witnesses with inconsistent statements. (Dkt. 1, p. 6-7.)

Second, Petitioner raises a prosecutorial misconduct claim. He claims the prosecution: (a) improperly accused Petitioner of committing "other crimes" during cross-examination, specifically that Petitioner unlawfully possessed police reports in his jail cell and committed fraud in procuring a sewer business license for the purported business venture with J.V.'s father; (b) improperly asked Petitioner to comment on the credibility and testimony of other witnesses during cross-examination; (c) made improper speaking objections during trial; and (d) shifted the State's burden of proof during the rebuttal portion of closing argument. *Id.* at 8-9.

Finally, Petitioner contends the trial court was biased against him as demonstrated by the trial court's improper remarks, including: (a) the court's admonishing defense counsel; (b) the court's declining to give counsel more time in closing argument; and (c) the court's instructing the jurors to continue deliberating in response to their note that they were deadlocked. *Id.* at 12-13. Petitioner's judicial bias claim also challenges the trial court's rulings, including: (a) allowing the State to introduce evidence of the pending Lake County criminal case as "other crimes" evidence during J.V.'s direct examination, but barring admission of the corresponding monetary demand during J.V.'s cross-examination; and (b) denying Petitioner's request to instruct the jury that Petitioner did "nothing wrong" by having the police reports in his jail cell. *Id.*

As explained below, none of Petitioner's claims warrant federal habeas corpus relief. The claims are both procedurally defaulted and meritless.

## I. Procedural Default

### Claims One, Two, and Three are Procedurally Defaulted under the Exhaustion Doctrine

State prisoners must "exhaust[] the remedies available in the courts of the State" before seeking federal habeas corpus relief. *Shinn v. Ramirez*, 142 S. Ct. 1718, 1732 (2022) (quoting 28 U.S.C. § 2254(b)(1)(A)). "State courts, like federal courts, are obliged to enforce federal law."

*O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999). The exhaustion requirement thus affords "States 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Shinn*, 142 S. Ct. at 1732 (quoting *Duckworth v. Serrano*, 454 U.S. 1, 2 (1981) (per curiam)).

To satisfy the exhaustion requirement, an Illinois prisoner must raise his federal claim through one complete round of state court review, including in a PLA to the state supreme court, and do so in accordance with the state's procedures. *Shinn*, 142 S. Ct. at 1732 ("to allow a state prisoner simply to ignore state procedure on the way to federal court would defeat the evident goal of the exhaustion requirement"); *Boerckel*, 526 U.S. at 845. Inherent in this obligation is the duty to present fairly the federal claim to the state courts by articulating "both the operative facts and the controlling legal principles on which [the] claim is based." *Perruquet v. Briley*, 390 F.3d 505, 519 (7th Cir. 2004).

Four factors are considered when determining whether a habeas corpus petitioner has "fairly presented" his federal claim to the state courts: "1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation." *Hicks v. Hepp*, 871 F.3d 513, 531 (7th Cir. 2017) (citing *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001)). While these factors guide the Court's inquiry, the "overall 'task is to determine in practical terms whether the state courts were sufficiently alerted to the nature of [the petitioner's] federal constitutional claim.'" *Id.* (quoting *White v. Gaetz*, 588 F.3d 1135, 1139 (7th Cir. 2009)). The failure to present fairly a federal issue for the state court's review results in

procedural default of the claim. *Sanders v. Radtke*, 48 F.4th 502, 509 (7th Cir. 2022); *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016).

As discussed below, Petitioner did not fairly present Claims One, Two, or Three in either his direct appeal or postconviction PLA. These claims are therefore procedurally defaulted.

### A.     Direct Appeal

On direct appeal, Petitioner raised various grounds of prosecutorial misconduct (Claim Two) and judicial bias (Claim Three). (Dkt. 17-1, p. 28-47.) He abandoned these claims in his counseled PLA, seeking leave to appeal only the state appellate court's decision as to his claim that he was denied his constitutional right to present a complete defense. (Dkt. 49-1.) In failing to raise his prosecutorial misconduct and judicial bias claims to the state supreme court in his PLA, Petitioner did not exhaust Claim Two or Three on direct appeal. *Boerckel*, 526 U.S. at 845.

### B.     Postconviction Proceedings

In postconviction proceedings, Petitioner raised, for the first time, various grounds of ineffective assistance of trial counsel (Claim One) and re-raised claims of prosecutorial misconduct (Claim Two) and judicial bias (Claim Three). These claims were presented to both the state trial court in Petitioner's postconviction petition, (Dkt. 17-7), and to the state appellate court in Petitioner's *Finley* response. (Dkt. 17-9.) Petitioner, however, failed to present fairly Claims One, Two, and Three in his postconviction PLA. (Dkt. 17-11, p. 3-33.)

Petitioner's postconviction PLA challenged the state appellate court's decision to grant counsel's *Finley* motion and affirm the state trial court's summary dismissal, arguing a ruling on his appeal should not have been made in the absence of a response to his appeal by the State. (Dkt. 17-11, p. 4-5.)  Petitioner distilled his *Finley* challenge into five questions for the state supreme court's consideration. *Id.* at p. 6-7. Each of these questions related to the state appellate court's

power to rule on an "unopposed" appeal and whether such a ruling is violative of the Sixth, Eighth, or Fourteenth Amendments. *Id.* Petitioner argued that because the State never responded to his appeal, the Supreme Court of Illinois must accept the allegations in his brief as true and reverse the decision of the appellate court. *Id.* at 5.

Included in his postconviction PLA was a list of the issues that Petitioner presented to the intermediate appellate court on appeal:

A. Ineffective assistance of trial counsel

B. Failure to demand a speedy trial and move for dismissal

C. Failure to impeach witnesses

D. Failure to investigate and present exculpatory witnesses

E. Failure to present a complete defense

F. Prosecutorial misconduct

G. Judicial bias

(Dkt. 17-11, p. 5-6.) Following this list, Petitioner referred the reviewing court to his *Finley* response, which he attached as an exhibit to the PLA, *id.* at 12-20, stating the attachment provided "examples of the meritorious issues of this appeal." *Id.* at 6. A copy of the postconviction appellate court's summary order was also attached to the PLA as an exhibit. *Id.* at 30-33. Beyond directing the court to his *Finley* response, Petitioner's PLA did not contain any further argument on his ineffective assistance, prosecutorial misconduct, and judicial bias claims. (Dkt. 17-11, p. 2-9.)

Ordinarily, a state prisoner will not satisfy the "fair presentment" requirement under the exhaustion doctrine "if a judge must go outside the four corners of the document in order to understand the contention's nature and basis." *Lockheart v. Hulick*, 443 F.3d 927, 929 (7th Cir. 2006) (citing *Baldwin v. Reese*, 541 U.S. 27, 32 (2004)). If, however, a state's procedural rules

permit arguments by incorporation, then reference to another document may suffice to preserve a claim for federal habeas corpus review. *Id.* Illinois does not have such a rule. *Id.* Rather, Illinois litigants are instructed to include in their briefs "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citations of the authorities and pages of the record relied on." Ill. S. Ct. R. 341(h)(7). Arguments not raised in this manner are forfeited. *Id.*

Because Illinois's procedural rules do not permit Petitioner to incorporate by reference the arguments that he raised in his *Finley* response, the Court is "left with *Baldwin*: only arguments in the main body of the [PLA] have been preserved." *Lockheart*, 443 F.3d at 929. Under *Baldwin*, Petitioner failed to present fairly the substance of Claims One, Two, and Three in his postconviction PLA.[7] His claims are therefore procedurally defaulted under the exhaustion doctrine. *See Sanders*, 48 F.4th at 509.

## II. Exceptions to Procedural Default

Federal habeas corpus review of a procedurally defaulted claim is precluded unless "the petitioner demonstrates either (1) 'cause for the default and actual prejudice' or (2) 'that failure to consider the claim[] will result in a fundamental miscarriage of justice,'" i.e., new, reliable evidence exists such that no reasonable trier of fact would have found the petitioner guilty had such evidence been presented. *Thomas*, 822 F.3d at 386 (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). Petitioner cannot demonstrate either exception to excuse the procedural default of his claims.

---

7 The bullet points of claims without anything more in the postconviction PLA are insufficient to exhaust the claims either. *See Chambers v. McCaughtry*, 264 F.3d 732, 738 (7th Cir. 2001) ("passing reference to a constitutional issue" does not comprise fair presentment to the state courts).

### A. Petitioner Cannot Establish Cause and Prejudice to Excuse His Procedural Defaults

To demonstrate cause, "the prisoner must 'show that some objective factor external to the defense impeded [hi]s efforts to comply with the State's procedural rule.'" *Davila*, 137 S. Ct. at 2065 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Examples of cause include: (1) interference by officials making compliance impractical; (2) the factual or legal basis was not reasonably available to counsel; or (3) ineffective assistance of counsel. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *McCleskey v. Zant*, 499 U.S. 467 (1991)).

Petitioner argues that he did his best to present his claims and his lack of formal legal training should not be held against him. (Dkt. 36, p. 3-5, 12.) A habeas corpus petitioner's *pro se* status, however, cannot constitute cause to excuse a default. *See Harris v. McAdory*, 334 F.3d 665, 668 (7th Cir. 2003) (citing *Barksdale v. Lane*, 957 F.2d 379, 385-86 (7th Cir. 1992)); *United States ex rel. Maulding v. Cooper*, No. 91 C 7672, 1992 WL 162258, at *2 (N.D. Ill. July 1, 1992) ("alleged 'lack of familiarity with the intricacies of the law' … alone cannot constitute cause").

Petitioner further contends he was denied copies of his trial transcripts and the common law records for his Cook County criminal case and his Lake County criminal case and corresponding civil settlement. (Dkt. 36, p. 4.) This allegation is refuted by the record. In postconviction proceedings, Petitioner filed a motion for trial transcripts and common law records, (Dkt. 17-13, p. 424), which the trial court granted. *Id.* at 434, 501. There is no indication that Petitioner was not otherwise provided with the requested materials for use in postconviction proceedings. As to the unrelated Lake County case, Petitioner was not provided with trial transcripts from the criminal matter because the case was *nolle prossed*. *Id.* at 470. And there are no court records from the civil settlement because a civil case was never filed. (Dkt. 17-15, p. 463.)

Finally, the fact that Petitioner's appointed postconviction counsel was permitted to withdraw from the matter does not constitute cause. (Dkt. 36, p. 5.) An ineffective assistance of counsel argument asserted to excuse a default must, itself, be properly preserved in the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009). Petitioner did not exhaust such a claim. Additionally, alleged ineffective assistance of postconviction appellate counsel does not qualify as cause to excuse a procedural default as there is no constitutional right to counsel in state postconviction proceedings. *Davila*, 137 S. Ct. at 2063. Lastly, Petitioner's postconviction PLA, that he filed *pro se*, did not fairly present his federal claims, which is to say Petitioner is ultimately the cause of his own defaults.

## B.     Petitioner Has Not Demonstrated Actual Innocence to Excuse His Defaults

This leaves the fundamental miscarriage of justice (actual innocence) gateway to excuse Petitioner's defaults. "The fundamental miscarriage of justice standard erects an extremely high bar for the habeas petitioner to clear." *McDowell v. Lemke*, 737 F.3d 476, 483 (7th Cir. 2013). "It applies only in the rare case where the petitioner can prove that he is actually innocent of the crime of which he has been convicted." *Id.* (citations omitted). "To pass through the actual-innocence gateway to a merits review . . ., [a] petitioner must have 'new reliable evidence . . . that was not presented at trial' . . . and must persuade the district court that it is 'more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" *Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016) (quoting *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995)); *see House v. Bell*, 547 U.S. 518, 537 (2006) (quoting *Schlup*, 513 U.S. at 324) (a credible actual innocence claim "requires 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence…'"); *McDowell*, 737 F.3d at 483-84 (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005)) ("[A]dequate evidence is 'documentary,

biological (DNA), or other powerful evidence: perhaps some non-relative who places him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'").

Petitioner provides no evidence establishing his innocence. His reply brief appears to suggest judicial misconduct occurred because two judges involved in his case were allegedly connected in some way to former Chicago Police Department Commander Jon Burge. (Dkt. 36, p. 6.) Neither of these judges, however, presided over Petitioner's trial. Although Petitioner claims one of the judges demonstrated "personal bias" against him during a substitution-of-judge hearing, such an allegation falls well short of demonstrating Petitioner is actually innocent of sexually assaulting J.V. *Buie v. McAdory*, 341 F.3d 623, 626 (7th Cir. 2003) ("A defendant who asserts actual innocence as a reason to excuse a procedural default must *demonstrate* innocence.") (emphasis in original); *see also Hinton v. Uchtman*, 395 F.3d 810, 822 (7th Cir. 2005) (Wood, J., concurring) (explaining that claiming misconduct in other cases is insufficient, the prisoner must demonstrate misconduct in his case).

The same could be said for the affidavit Petitioner provides from Major Andrew S. Miller, Jr. of The Salvation Army. (Dkt. 27, p. 105.) The statements contained in this affidavit speak only to Miller's opinion of Petitioner's character; they do not in any way establish that Petitioner did not sexually assault the victim.

Finally, Petitioner includes a letter written to him by J.V.'s uncle, who alleges Petitioner is innocent and was framed by J.V.'s father. (Dkt. 37, p. 27-52.) Petitioner, however, presented this theory at trial and the uncle testified to that effect—claiming he heard J.V.'s father say he planted the T-shirt in this case. (Dkt. 17-15, p. 1147.) The jury rejected this theory and reasonably so, given the ample evidence presented at trial corroborating J.V.'s testimony that he was sexually assaulted by Petitioner:

- there was a noticeable crack in Petitioner's apartment door from slamming it to prevent J.V. from leaving;

- Petitioner's neighbor testified that she heard an altercation coming from Petitioner's apartment on the day of the assault, including the sound of Petitioner's door being slammed;

- two jockstraps matching the description provided by J.V. were recovered from Petitioner's apartment following the assault;

- a bottle of lubricant was found in the exact location J.V. had described during his testimony;

- the semen stain on the T-shirt that J.V. was wearing during the sexual assault matched Petitioner's DNA; and

- Petitioner sent a text message to J.V.'s phone threatening him if he told anyone about the assault.

In short, Petitioner does not offer the kind of reliable evidence, i.e., "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," to support his claim of actual innocence. *Schlup*, 513 U.S. at 324. Petitioner only repeats his theory from trial that he was framed. That the jury disbelieved this theory is not sufficient to establish actual innocence.

Because Petitioner has demonstrated neither cause and prejudice nor actual innocence, he cannot excuse the procedural defaults of Claims One, Two, and Three.

## III.    Claims One, Two, and Three Also Fail On the Merits

In addition, the Court notes that Claims One, Two, and Three are meritless.

### A.    Claim One:    Ineffective Assistance of Trial Counsel

Claim One raises various grounds of ineffective assistance of trial counsel. (Dkt. 1, p. 5-7.) To prevail on a claim of ineffective assistance of trial counsel, Petitioner must show both deficient performance and resulting prejudice. *Westray v. Brookhart*, 36 F.4th 737, 749 (7th Cir. 2022) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). The performance prong is satisfied where counsel's performance "falls below an objective standard of reasonableness," and

24

the prejudice prong is satisfied only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. "A petitioner is entitled to habeas relief only if he satisfies both of *Strickland*'s prongs." *Karr v. Sevier*, 29 F.4th 873, 880 (7th Cir. 2022) (internal quotation marks and citation omitted). Importantly, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an effectiveness claim on the ground of lack of sufficient prejudice…that course should be followed." *Id.*

Petitioner's ineffective assistance of trial counsel claim fails because he cannot establish *Strickland* prejudice. As discussed above, there was overwhelming evidence of Petitioner's guilt. The victim testified not only to the sexual assault itself, but also to Petitioner's grooming behaviors leading up to the sexual assault. The victim's testimony was corroborated by the testimony of Petitioner's neighbor and the threatening text message received from Petitioner, as well as the physical evidence found in Petitioner's apartment, including the cracked door, the jockstraps, and the personal lubricant. More significantly, Petitioner's DNA was on the semen-stained shirt that the victim was wearing during the sexual assault. Finally, it cannot be overlooked that the victim testified to a second sexual incident perpetrated by Petitioner that resulted in a civil settlement.

There is no reasonable probability that the outcome of this case would have been different. *See Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming support."). Claim One is meritless.

25

### B. Claim Two: Prosecutorial Misconduct

In Claim Two, Petitioner raises various claims of prosecutorial misconduct that he contends deprived him of a fair trial. (Dkt. 1, p. 8-9.) Claims of prosecutorial misconduct are governed by the two-step framework established in *Darden v. Wainwright*, 477 U.S. 168 (1986). *Ruvalcaba v. Chandler*, 416 F.3d 555, 565 (7th Cir. 2005). Under this framework, Petitioner must show that the prosecutor's remarks were both improper and prejudicial. *Id.* In determining the latter prong, "'it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Darden*, 477 U.S. at 181). The most important consideration when conducting the prejudice inquiry is the weight of the evidence against Petitioner. *Howard v. Gramley*, 225 F.3d 784, 793 (7th Cir. 2000). "[S]trong evidence of guilt eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations." *Lieberman v. Washington*, 128 F.3d 1085, 1098 (7th Cir. 1997) (internal quotation marks and citations omitted) (alterations in original).

Here, too, Petitioner's prosecutorial misconduct claim fails on the prejudice prong. Even if this Court were to find the challenged remarks were ill-advised or improper, the overwhelming evidence against Petitioner does not support a finding that such remarks "so infected the trial with unfairness" as to constitute a denial of due process. *Ruvalcaba*, 416 F.3d at 565. As has been discussed at length, the evidence against Petitioner was more than ample. J.V.'s testimony, the cracked door, the jockstraps, the lubricant, the text message, and the semen-stained T-shirt all implicated Petitioner in the crime. In light of such strong evidence of guilt, Petitioner cannot show that he was prejudiced by any of the errors he alleges the State committed during trial. *See Lieberman*, 128 F.3d at 1098. Claim Two is without merit.

### C.    Claim Three: Judicial Bias

Finally, in Claim Three, Petitioner contends that he was denied a fair trial because the court was biased against him. (Dkt. 1, p. 11-13.) He challenges both the trial court's remarks and unfavorable rulings on these grounds. *Id.* Petitioner's bias claims are governed by *Liteky v. United States*, 510 U.S. 540 (1994). *See Lockheart*, 443 F.3d at 929-30 (applying *Liteky* in a § 2254 habeas corpus proceeding). To establish judicial bias, Petitioner must show the trial court displayed "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555. This inquiry requires an objective assessment of the alleged bias. *See Gacho v. Wills*, 986 F.3d 1067, 1075 (7th Cir. 2021) (citing *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 866 (2009)) ("Due process claims based on judicial bias require an objective assessment of the likelihood of bias …").

The remarks challenged by Petitioner do not come close to "approach[ing] the level of acrimony" that *Litkey* requires. *Lockheart*, 443 F.3d at 929-30. Most of the comments challenged by Petitioner reflect the trial court's efforts at courtroom administration. *See Litkey*, 510 U.S. at 556 ("ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts…" do not amount to bias). Others demonstrate, at most, a degree of frustration or impatience with defense counsel. *Id.* at 555-56 ("expressions of impatience, dissatisfaction, annoyance, and even anger" are not sufficient to establish bias). None of the challenged comments display a degree of antagonism, let alone the extreme degree that is required, for a finding of judicial bias. *Cf. Litkey*, U.S. at 555 (quoting *Berger v. United States*, 225 U.S. 22 (1921)) (providing the example of *Berger*, a World War I espionage case against German-American

defendants, as an incident of judicial bias when the trial judge stated the defendants "'hearts are reeking with disloyalty.'"). Accordingly, Petitioner's judicial-comments argument fails.

Petitioner's challenges to the trial court's rulings do not fare any better. Judicial rulings "almost never constitute a valid basis for a bias or partiality" claim. *Litkey*, 510 U.S. at 555. Rather, challenges to judicial rulings are proper grounds for appeal. *Id.* Petitioner shows nothing more than disagreement with the trial court's rulings that were not in his favor. That some of the trial court's rulings were unfavorable to Petitioner does not demonstrate, or even suggest, bias. His judicial bias claim is meritless.

For the reasons discussed above, Petitioner is not entitled to habeas corpus relief on any of his claims as they are procedurally defaulted and, in any case, meritless. His habeas corpus petition is denied.[8]

---

[8] The Court notes that Petitioner includes with his habeas corpus petition an appendix entitled "Statement of the Case." (Dkt. 1, p. 46-53.) Within this appendix is a citation to the legal standard governing a defendant's right to present a complete defense. *Id.* at p. 51. The Court recognizes that Petitioner raised a "complete defense" argument before the state courts on direct appeal, but he makes no reference to such a claim in the body of his habeas corpus petition. Rather, his habeas corpus petition asserts three claims (ineffective assistance of trial counsel, prosecutorial misconduct, and judicial bias) and provides facts supporting each of these grounds as required. *Id.* at p. 5-13. The petition neither alleges that Petitioner was denied his right to present a complete defense nor provides any facts that would support such a claim. *Id.* Indeed, this Court is led to Petitioner's reference to the right to present a complete defense in the appendix only by way of Petitioner's ineffective assistance of trial counsel claim. *Id.* at p. 6. Although "courts are required to give liberal construction to pro se pleadings," it is well established that "pro se litigants are not excused from compliance with procedural rules." *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) (citations omitted). Petitioner's "complete defense" legal citation clearly does not comport with the pleading requirements for habeas corpus petitions and, therefore, is not considered a substantive claim by this Court. *See* Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts; *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (explaining that Rule 2 requires a higher pleading standard than the general pleading requirement under Rule 8 of the Federal Rules of Civil Procedure as a habeas corpus claim must include facts supporting the claim). In any case, any alleged error as to Petitioner's ability to present his defense would not have had a "substantial and injurious effect" on the verdict, *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993), because there is overwhelming evidence against Petitioner, including the semen-stained T-shirt recovered from the victim's closet that matched Petitioner's DNA, Petitioner's text

## IV.    Certificate of Appealability

The Court declines to issue a certificate of appealability. Such a certificate "may not issue 'unless the applicant has made a substantial showing of the denial of a constitutional right'" or error with this Court's procedural determinations. *Slack v. McDaniel*, 529 U.S. 473, 483 (2000) (quoting 28 U.S.C. § 2253(c)). Petitioner must show that reasonable jurists could debate whether this Court should have resolved his claims differently or that the issues are "adequate to deserve encouragement to proceed further." *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing *Slack*, 529 U.S. at 484) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Petitioner cannot meet this standard.

## CONCLUSION

Petitioner's habeas corpus petition is denied. (Dkt. 1.) Any pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk is direct to enter a judgment in favor of Respondent and against Petitioner. Civil case terminated.

**SO ORDERED.**
                                      **ENTERED: December 2, 2022**

                                            _____
                                            **HON. JORGE ALONSO**
                                            **United States District Judge**

---

message to the victim telling him not to tell anyone about the incidents, the victim's testimony, Petitioner's neighbor's hearing the incident from her apartment, and the police's search uncovering evidence at Petitioner's apartment consistent with the victim's account, including the cracked apartment door, jockstraps, and lubricant.